UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MICHAEL K., : | |
|     Plaintiff, : | |
| : | |
| v. : | C.A. No. 20-541MSM |
| : | |
| KILOLO KIJAKAZI, : | |
| Acting Commissioner of Social Security, : | |
|     Defendant. : | |

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Now thirty-eight years old, Plaintiff Michael K. was born prematurely in 1983; he suffered birth-related injuries that his parents and treating providers link to his ongoing emotional and cognitive impairments. Tr. 78, 96, 420, 594-95. He was first found to be disabled when he was twelve. Tr. 30. As a child, he received special education but was able to graduate from high school and complete four college courses. Tr. 70, 420. In 2009,[1] when he was twenty-six, Plaintiff was found to be still suffering from an ongoing disability based on a borderline IQ, learning difficulties, attention deficit hyperactivity disorder ("ADHD"), anxiety, and depression, with marked difficulties with attention, concentration and persistence. Tr. 102, 405-18. However, during a 2017 cessation disability review, which focused on Plaintiff's recent mental status examinations and particularly his recent work history at a hospice facility,[2] Plaintiff was found to have the residual function capacity ("RFC")[3] to perform simple work over two-

---

[1] The record developed for the pending applications does not contain treating medical records prior to 2007.

[2] Plaintiff was employed as an "administrative assistant" at a hospice facility from 2014 through December 1, 2017; he earned more than $20,000 per year in 2015, 2016 and 2017. Tr. 30, 249, 595, 692.

[3] "RFC" or "residual functional capacity" is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).

hour periods at a non-pressured pace with minimal social contact. Tr. 106-12. Because that RFC permitted work, as of October 19, 2017, Plaintiff's benefits ceased. Tr. 116.

Less than two months later (on December 1, 2017), Plaintiff was laid off by the hospice facility, the job that had been material to the cessation determination. Almost a year later, still unable to find paid work, Plaintiff filed the pending applications for Disability Insurance Benefits ("DIB") under 42 U.S.C. § 405(g) of the Social Security Act (the "Act"), and Supplemental Security Income ("SSI") under § 1383(c)(3). Tr. 30. As amended at the hearing, his alleged onset date is December 2, 2017, the day after he was laid off. Tr. 31, 325.

The current applications allege that Plaintiff is disabled due to a learning disability, severe anxiety and ADD. Tr. 116. Based on post-application testing, Plaintiff also contends that he is impaired by borderline intellectual functioning. Tr. 696. These claims were presented to an administrative law judge ("ALJ"), who agreed that anxiety, depression, ADHD and "learning disorder-math" are severe impairments at Step Two but found that Plaintiff's RFC permits him to perform work involving simple, familiar, object-oriented tasks with occasional interaction with supervisors, coworkers and the general public. Tr. 33, 35. This RFC largely tracks the one that resulted in the October 2017 cessation decision. Following an unsuccessful request for Appeals Council review, the denial by the Commissioner of Social Security ("Commissioner") of Plaintiff's applications became final.

Now pending before the Court is Plaintiff's motion to reverse the decision of the Commissioner. ECF No. 13. He argues that the ALJ's findings are tainted by error, requiring remand. Defendant Acting Commissioner Kilolo Kijakazi ("Defendant") of the Social Security Administration ("SSA") argues that the ALJ properly applied the law to the substantial evidence of record; he has filed a counter motion for an order affirming the decision. ECF No. 16. The

motions have been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

I.  **Background**

This case is factually complex in that the record features conflicting evidence from Plaintiff himself on one hand, and his parents and current work supervisor on the other, regarding his ability to function in the workplace and otherwise. Due to the lack of insurance, it features relatively sparse treating source records, which contain relatively benign mental status examination ("MSE") findings. But it also features the reports of three examining expert psychologists and an examining psychiatrist; their objective clinical testing and observations over the period from 2007 to 2020 establish that Plaintiff has suffered from low cognitive functioning; a serious impairment in the ability to concentrate, attend and persist; significant anxiety (particularly social anxiety); depression; and a learning disability related to mathematics. To make her decision, the ALJ resolved the factual conflicts by relying on Plaintiff (despite argument that his impairments cause him to lack appropriate insight into his symptoms) and discounting as not persuasive or not probative evidence from his parents and his work supervisor. The ALJ also placed significant weight on less-qualified treating sources but discounted or ignored the reports of the expert psychologists. In reliance principally on a state agency non-examining psychologist who reviewed a materially incomplete record and made the illogical finding that both ADHD and Plaintiff's learning disability are non-severe, the ALJ found that Plaintiff could work.

A.  **Examining and Non-examining Psychiatrists and Expert Psychologists**

The first report in the record is an initial psychiatric assessment performed by Dr. James Bonnar in November 2007, when Plaintiff was twenty-four. Tr. 420. Noting that Plaintiff's

work attempts, even those that were "sheltered," Tr. 61, ended in failure due to Plaintiff's anxiety (resulting in his inability to function if scrutinized or criticized and causing him to wander off) and his mathematics learning disability (resulting in the inability to be a cashier), Dr. Bonnar diagnosed a learning disorder, anxiety disorder and depressive disorder, with social isolation.  Tr. 420-23.

Next is a consulting examination performed by a state agency psychologist, Dr. Sol Pittenger, on November 10, 2009, when Plaintiff was twenty-six.  Tr. 445.  At the request of SSA, Dr. Pittenger performed an extensive battery of tests and conducted a clinical interview.  Plaintiff's scores fell into the borderline/low average range, with a significant discrepancy between verbal and perceptual reasoning scores, as well as weak math scores, with intrusions and some inconsistency due to inattention and impulsivity.  Tr. 448-49.  Dr. Pittenger noted Plaintiff's limited social network and tense/anxious affect and diagnosed ADHD, anxiety and depression.  Tr. 449.  Based on Dr. Pittenger's report, SSA made the following finding:

> It was determined that [Plaintiff] would be unable to consistently understand and remember tasks presented to him in the workplace.  Due to fluctuating attention and concentration he was found to be unable to complete tasks in even one [hour] blocks of time over an 8 [hour] day, unable to relate to others and unable to accept ordinary changes.

Tr. 104-105.

Almost eight years after the Pittenger report, Plaintiff's file was reviewed by a non-examining expert psychologist, Dr. Ryan Haggarty, in connection with the 2017 cessation disability review.[4]  Tr.102-13.  Dr. Haggarty focused on the evidence of Plaintiff's ongoing employment as an administrative assistant at the hospice facility: "he usually works 25 hours/week but . . . it was noted that 'worked 40 hours last week and will probably have 40 hours

---

[4] Plaintiff was not represented by an attorney during this review.  Tr. 102.

again this week.'"  Tr. 107.  Despite Plaintiff's acknowledged limitation in sustaining persistence and concentration and in interacting socially, Dr. Haggarty found that Plaintiff could recall simple work instructions and carry out simple tasks for two-hour periods in less socially demanding settings.  Tr. 109-10.  Based on this finding, benefits ceased.

The next examining report by an expert psychologist was signed on January 19, 2019, in connection with the current applications, almost ten years after the Pittenger report.  It was performed by Dr. Louis Cerbo, who was engaged by SSA for a consulting examination.  Tr. 594-98.  Dr. Cerbo relied on Dr. Pittenger's test scores as establishing intellectual functioning in the borderline deficient range, with mildly deficient mathematics skills.  Tr. 595.  Dr. Cerbo's own testing yielded significant elevation for inattention and sustained concentration and resulted in the observation that Plaintiff's ability to maintain task persistence is "weak associated with attention deficits."  Tr. 598.  Dr. Cerbo concluded: "his prognosis is guarded due to the presence of anxiety, depression and inattention affecting his everyday functioning and making it difficult for him to focus and maintain his emotional stability with work environment."  Tr. 597.

Soon after the Cerbo report was completed, an initial phase file review was conducted by a state agency psychologist, Dr. John Warren, on January 29, 2019.  Tr. 118-25.  Although the Cerbo, Pittenger and Bonnar reports were all in the record, and the Cerbo report is mentioned in the additional explanation (Tr. 120), Dr. Warren opined that neither ADHD nor the mathematics learning disability are severe; he found no limit in Plaintiff's ability to understand and remember and no limit in Plaintiff's ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes.  Tr.  119-23.  In June 2019, on reconsideration, the file was reviewed again, this time by Dr. Haggarty (the same psychologist who has done the 2017 file review for the cessation disability review).  Tr. 139.  Dr. Haggarty did not endorse the findings

5

of Dr. Warren. Instead, he opined to severe ADHD and learning disability, as well as depression and anxiety; his RFC largely tracks his own findings from 2017, yielding the conclusion that, while seriously limited, Plaintiff could still work. Tr. 143, 145-47. Dr. Haggarty's "additional explanation" is laser focused on Plaintiff's having worked at the hospice facility for three years. Tr. 144.

Unseen by Drs. Warren and Haggarty is an extensive psychological evaluation report prepared by Dr. Jorge Armesto, an expert psychologist who has significant experience in performing assessments as an SSA examiner. However, in this instance, Dr. Armesto's examination and testing, done on February 11, 2020,[5] was performed at the request of Plaintiff's attorney. Tr. 691.

Dr. Armesto administered tests that apparently had not been done in more than ten years (since the Pittenger report). Like Dr. Pittenger, Dr. Armesto made the objective clinical findings that Plaintiff meets the diagnostic criteria for ADHD, anxiety, and depression, with an overall cognitive ability in the borderline range. Tr. 691-96. On clinical interview, Dr. Armesto noted that Plaintiff's prior employment (at the hospice facility) was usually part time and that his supervisor had helped him when anxiety overwhelmed him, as well as that, since that job ended, his "social anxiety has intensified." Tr. 692-93. Dr. Armesto's objective test scores reflect verbal reasoning in the low average range, but nonverbal reasoning, the ability to sustain attention, concentrate and exert mental control all in the borderline range, with mathematics in

---

[5] Confusingly, Dr. Armesto's report states that his examination was conducted on February 11, 2020, but his supplemental and emotional impairment questionnaires are dated January 9, 2020. The parties do not mention this anomaly; therefore, the Court has not considered it.

the "[e]xtremely [l]ow" range. Tr. 693-95. For RFC findings, Dr. Armesto found marked and extreme limitations. Tr. 700-01.[6]

### B. Plaintiff's Treating Source Evidence

Because of insurance issues, Plaintiff's mental health treatment during the period covered by the record is spotty, with only occasional therapy and gaps where only his primary care practitioner, Dr. Matthew Salisbury, was attending to his needs. Tr. 10, 88-89. This limited record contains several MSE observations made by Dr. Salisbury, two made by a neurologist who saw Plaintiff for migraine treatment; one by a brain surgeon who assessed an apparently benign brain abnormality; and a handful by three different mental health counselors. In addition, at the very end of the period, referred by his attorney, at the urging of Dr. Salisbury and through the persistence of his parents, Plaintiff was able to establish a treating relationship with a psychiatrist, Dr. Anthony Gallo, who also performed a handful of MSEs. Tr. 51, 90, 702.

Overall, as the ALJ accurately found, these MSEs are generally within normal limits, including normal attention, speech and memory, with occasional observations of guarding, depression, anxiety and impaired concentration. E.g., Tr. 461, 480, 505, 520, 615-17, 628. Nevertheless, by late 2019, Dr. Salisbury's treating notes reflect Plaintiff's worsening anxiety and Dr. Salisbury's opinion that Plaintiff needed a higher level of mental health treatment. Tr. 673 ("chronic anxiety issues with breakthrough sx despite compliance with [medication] . . . . We discussed need to establish care with psychiatry in order to get the appropriate expertise in care of his chronic psychiatric issues."); see Tr. 682 ("He notes that his anxiety is worsening. He

---

[6] After the ALJ's decision issued, another neuropsychological report was performed by psychologist Dr. Diane Whipple at the request of Plaintiff's primary care physician. Tr. 9. The Whipple report appears to be entirely consistent with the Pittenger report and the Armesto report. However, because it postdates the ALJ's decision, it is not pertinent to what is before the Court.

7

has not been able to find a psychiatrist that accepts his insurance."). Because of the timing of the latter notes, the non-examining psychologists (Drs. Warren and Haggarty) did not see them.

C.     **Plaintiff's Functioning at School, Home and Work**

The evidence of Plaintiff's functioning at school, home and work comes from Plaintiff himself, as well as from his parents and Ms. Mary Anne Quinn, the Coordinator of Adult Services at the public library where Plaintiff had served as a volunteer.

Regarding Plaintiff's education, his parents testified that he attended special schools (Meeting Street and the Trudeau Center) with placement in a self-contained classroom through the end of high school; he was able to complete a few art courses at a community college because art was an area of strength. Tr. 35, 60, 78-80. Once he was required to take courses that were more general in orientation, Plaintiff was unable to function and dropped out of college. Tr. 80. By contrast, Plaintiff testified that he dropped out of college because he did not "have the funds at the time." Tr. 71.

Regarding the ability to live independently, Plaintiff's parents testified and/or submitted a statement that reflected that they have supported him and handled many of the tasks of daily living (such as hygiene reminders, cooking and cleaning) for him throughout his life, as well as that his short period of living independently was unsuccessful in that he was taken advantage of and could not handle money. Tr. 84-85, 91, 329. For example, the evidence establishes that, while Plaintiff can drive, it took two to three years for him to get his license, he has been unable to manage car insurance, the car he drives is owned by his parents and he has had three accidents that his parents had to deal with. Tr. 84-86. Plaintiff's mother confirmed Plaintiff's inability to function socially. Tr. 88 ("He's never had any true friend[s]."). Plaintiff himself testified that he

was able to live independently in 2016 and 2017 and functioned better than he does at home, as well as that he plans to move out again. Tr. 68-69.

Regarding work, his parents testified that all the jobs that Plaintiff has held for more than a short period of time were "sheltered" in that he was supervised by a trusted older adult who accommodated his inability to perform and his failures to appear. Tr. 86-89, 93-96, 369. For example, for two seasons, Plaintiff worked for a small airline and then briefly at a parking lot; the airline job was procured for him by his father who worked there and supervised Plaintiff's work. Tr. 86, 93-95, 311. The father testified (based on first-hand observation) that Plaintiff was unable to manage the work without significant errors and he would walk away or leave when the job made him anxious or he could not concentrate. Tr. 93-95 ("he gets very frustrated very easily"; "he shuts off"; "[he] walk[s] away"). The father also stated that he helped Plaintiff to get the parking lot job, but it resulted in failure quickly because Plaintiff "forgot to charge people." Tr. 95. Plaintiff's parents both provided testimony and statements regarding the job at the hospice facility (which Plaintiff held from 2014 until 2017 and resulted in the cessation of benefits); they explained that it had been procured through their intervention[7] and that, while he was full time for a period, "he had to be shadowed by a supervisor" who "would always protect [Plaintiff]. So then when she got laid off, then his work, the ability went south. And then they end up laying [him] off."[8] Tr. 94; see Tr. 369. After he lost this job in December 2017, Plaintiff searched for work and tried a job training program but was unsuccessful. Tr. 369. In contrast to

---

[7] Plaintiff's mother explained that the hospice facility job was an SSA "Ticket to Work" position for which Plaintiff was hired after a period of volunteering. Tr. 329, 369.

[8] Plaintiff's parents both testified that the latter information – that Plaintiff's seeming success in working up to full time at the hospice facility was because of a supervisor who acted as his shadow and that, when she went out on a leave of absence, he failed and lost the job – is based on what Plaintiff told them as these events were unfolding. That is, unlike the other descriptions of Plaintiff's work, this is not based on first-hand observation.

his parents, Plaintiff himself testified that he did not receive any special accommodations or extra guidance while working at the hospice facility. Tr. 66.

In the present, the record reflects that Plaintiff has been working for several years[9] as a volunteer at a public library for between two and five hours a day, several days a week. His mother explained that they (the parents) got him this volunteer position in the hope that it might evolve into a real job. Tr. 87, 329. Despite the position having lasted for years, the library has declined to offer Plaintiff employment; instead, he performs "volunteer tasks" under the supervision of Ms. Quinn, who is the Coordinator of Adult Services. Ms. Quinn provided a letter setting out her observations of Plaintiff at the library over seven to eight years, two to three hours daily, several days a week. Tr. 397. It includes her description of behaviors that co-workers find to be "bothersome" and "creepy," of his struggle to control emotions in the workplace, and of his inability to persist in that he sometimes abruptly leaves and has disappeared for days or weeks at a time. Id. By contrast, Plaintiff said he interacts with a lot of people while volunteering at the library and that, if offered more hours, he would handle it. Tr. 66-68.

The non-examining psychologists (Drs. Warren and Haggarty) did not see Ms. Quinn's statement, with its first-hand observations of Plaintiff's off-putting (to co-workers) workplace social behaviors and work-avoidant behaviors.

## II.  Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v.

---

[9] Plaintiff testified that he had been volunteering at the library for ten years. Tr. 67.

10

Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999), aff'd, 230 F.3d 1347 (1st Cir. 2000) (per curiam).  Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128-131 (1st Cir. 1981).  The determination of substantiality is based upon an evaluation of the record as a whole.  Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30.  The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  Id. at 31.  If the Court finds either that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim, the Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g).  Allen v. Colvin, C.A. No. 13-781L, 2015 WL 906000, at *8 (D.R.I. Mar. 3, 2015) (citing Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir.1996)).

### III.     Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

11

twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 404.1505.[10]  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.     The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 404.1520.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted.  20 C.F.R. § 404.1520(g).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  Sacilowski v. Saul, 959 F.3d 431, 434 (1st Cir. 2020); Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims).

### B.     Opinion Evidence

For applications like this one, filed on or after March 27, 2017, an ALJ must consider the persuasiveness of all medical opinions in a claimant's case record.  See 20 C.F.R. § 404.1520c.

---

[10] The SSA has promulgated identical sets of regulations governing eligibility for DIB and SSI.  See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986).  For simplicity, I cite only to one set of these regulations.

The most important factors to be considered when the Commissioner evaluates persuasiveness are supportability and consistency; these are usually the only factors the ALJ is required to articulate. 20 C.F.R. § 404.1520c(b)(2); Jones v. Berryhill, 392 F. Supp. 3d 831, 839 (M.D. Tenn. 2019); Gorham v. Saul, Case No. 18-cv-853-SM, 2019 WL 3562689, at *5 (D.N.H. Aug. 6, 2019). Supportability "includes an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or . . . medical finding[] is with other evidence in the claim." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5859 (Jan. 18, 2017). Other factors that are weighed in light of all the evidence in the record includes the medical source's relationship with the claimant and specialization, as well as "other factors" that tend to support or contradict the medical opinion or finding. See 20 C.F.R. § 404.1520c(c)(1)-(5); Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. at 5859. In other words, "[a] medical opinion without supporting evidence, or one that is inconsistent with evidence from other sources, [is] not . . . persuasive regardless of who made the medical opinion." Id. at 5854.

      **C.**     **Reliance on Experts**

An ALJ cannot render a medical opinion in the face of conflicting and inconsistent medical evidence without the assistance of a medical expert. Santiago v. Sec. of Health & Human Servs., 944 F.2d 1, 7 (1st Cir. 1991) ("[A]n expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person."). If the medical evidence is such that a "reasonable mind might accept [it] as adequate to support a conclusion" of disability, the ALJ cannot rest on his untutored lay analysis to interpret it otherwise. Sherry B. v. Saul, 518 F. Supp. 3d 590, 591 (D.R.I. 2021) (cleaned up). Relatedly, it is error for an ALJ to deny benefits in reliance on a

non-examining expert physician or psychologist who, despite expertise, was not privy to parts of the medical record that evidence worsening or that support the claimed limitations. Padilla v. Barnhart, 186 F. App'x 19, 22-23 (1st Cir. 2006) (per curiam); Virgen C. v. Berryhill, C.A No. 16-480 WES, 2018 WL 4693954, at *3 (D.R.I. Sept. 30, 2018); Cruz v. Astrue, No. C.A. 11-638M, 2013 WL 795063, at *13 (D.R.I. Feb. 12, 2013), adopted, 2013 WL 802986 (D.R.I. Mar. 4, 2013). In such circumstances, without procuring testimony from a medical expert who has interpreted the entire medical file, the ALJ is substituting his lay judgment for a necessary expert medical opinion; the resulting decision is subject to remand because it is not supported by substantial evidence. Hall v. Colvin, 18 F. Supp. 3d 144, 152 (D.R.I. 2014).

### D. Assessing Credibility of Testimony and Statements of Claimant and Third Parties

When an ALJ decides not to fully credit testimony or statements by the claimant or by percipient witnesses (such as Plaintiff's parents and Ms. Quinn), that decision "must be supported by substantial evidence and the ALJ must make specific findings as to the relevant evidence [s]he considered in determining to disbelieve the [individual.]" Sacilowski, 959 F.3d at 441 (internal quotation marks omitted). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. See Frustaglia, 829 F.2d at 195. For an adult like Plaintiff, whose impairment may prevent him or her from describing symptoms adequately, SSA adjudicators may also consider a description of pertinent symptoms from a person who is familiar with the individual. SSR 16-3p, Titles II & XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *6-7 (Oct. 25, 2017) ("other sources" may provide information regarding an individual's statements related to symptoms). This includes persons such as parents or an adult who has made personal observations of the individual. Id.; see Paul M. Ryther & Barbara Samuels, Social Security Disability Claims:

14

Practice and Procedure § 26:11 (Format of observational evidence of lay witness) (2d ed. 2021) ("It is especially important to have corroborating testimony from lay witnesses when the claimant's impairment prevents him or her from fully testifying in his or her own behalf.").

## IV.   Analysis

I recommend that this case be remanded for further proceedings for two reasons.  First, I find that the ALJ erred in relying solely on her lay analysis of the medical evidence supported only by the flawed administrative findings of Dr. Warren, the non-examining psychologist who opined at the initial phase based on a materially incomplete record that lacked subsequent evidence that supports the claimed limitations.  Andrea T. v. Saul, C.A. No. 19-505WES, 2020 WL 2115898, at *5 (D.R.I. May 4, 2020); see Padilla, 186 F. App'x at 22-23 (controlling weight should not be assigned to opinion based on incomplete medical record).  Second, I find that the ALJ failed to consider, indeed essentially ignored, the first-hand factual observations memorialized in the testimony and statements provided by Plaintiff's parents and Ms. Quinn.

The ALJ's decision states that she discounted the Cerbo and Armesto reports, instead relying entirely on Dr. Warren for her analysis of the complex medical evidence regarding Plaintiff's intellectual deficits, his impaired ability to attend, concentrate and persist, his severe anxiety (particularly social anxiety), his mathematical learning disability and severe depression.  Tr. 41.  This reliance is confusing.  Dr. Warren found that ADHD and the learning disability affecting mathematics both were "[n]on [s]evere."  Tr. 119.  These finding were rejected by Dr. Haggarty and are dramatically contradicted by Dr. Cerbo's clinical opinion that Plaintiff has a "[s]pecific [l]earning [d]isorder with mathematics," as well as that his "prognosis is guarded due to the presence of anxiety, depression and intention affecting his everyday functioning and making it difficult for him to focus and maintain his emotional stability with work environment"

15

and that Plaintiff's ability to maintain task persistence is "weak associated with attention deficits." Tr. 597-98.  The relevant conclusions in the Cerbo report mesh with the longitudinal record in that they echo the earlier analysis performed by Dr. Pittenger.  Yet Dr. Warren ignored them and the ALJ rejected them as "not probative." Tr. 41.  Exacerbating the puzzle is the reality that the ALJ's actual analysis appears to be inconsistent with her articulation of her reasoning – while purporting to be relying entirely on Dr. Warren and rejecting the Cerbo report as not probative, the ALJ's decision actually appears to reject the Warren findings, in that (with no explanation) it classifies ADHD and "learning disorder-math" as severe at Step Two.  Tr. 33.

It is conceivable that this is a technical error and the ALJ meant to rely not on Dr. Warren, but on Dr. Haggarty, the non-examining psychologist at the reconsideration phase.  However, the Commissioner does not argue that this is a technical error; to the contrary, he doubles down on the ALJ's reliance on Dr. Warren.  Further, this aspect of the opinion is too important for the Court to speculate regarding what the ALJ was really doing.  In a circumstance like this, where the decision is confusing and internally inconsistent with respect to such a pivotal part of the analysis, the Court is unable to ascertain whether the ALJ's conclusions are supported by substantial evidence.  Remand is necessary for clarification.  See Maxwell v. Comm'r of Soc. Sec., 778 F. App'x 800, 802, 803 (11th Cir. 2019) (remand required for ALJ to clarify "confusing" analysis; because ALJ had not adequately articulated reasoning, court could not "ascertain whether the ALJ's conclusions were rational and supported by substantial evidence") (per curiam) (internal quotation marks omitted); Altman v. Colvin, Case No. 14-cv-30190-KAR, 2015 WL 5145541, at *7 (D. Mass. Sept. 1, 2015) (when ALJ affords inconsistent and confusing treatment to report, resulting in failure adequately to explain reasoning, remand ordered).

The far more serious error tainting the ALJ's reliance on Dr. Warren emerges clearly when the Court considers all the evidence that Dr. Warren did not see. The ALJ tries to sidestep the problem with the throw-away finding that "subsequent evidence does not warrant a change in the pertinent finding of Dr. Warren or the persuasiveness of his opinion." Tr. 41. This finding does not withstand scrutiny. For example, Dr. Warren did not see the Armesto report, with its objective clinical testing data resulting in RFC findings of marked and extreme limitations. In addition, Dr. Warren did not see Dr. Salisbury's late 2019 treating notes reflecting Plaintiff's worsening anxiety and the need for a higher level of mental health treatment. And Dr. Warren relied on Plaintiff's volunteering at the public library but did not see Ms. Quinn's first-hand observations of how Plaintiff's impairments adversely and materially impacted his ability to function in that workplace.

It is well settled that remand is required if an ALJ's decision rests on the findings of a non-examining expert psychologist who was not privy to parts of the medical record that evidence worsening or that support the claimed limitations. Padilla, 186 F. App'x at 22-23; Virgen C., 2018 WL 4693954, at *3. Unless there is testimony from a medical expert who has interpreted the entire medical file, such a decision is not supported by substantial evidence. Hall, 18 F. Supp. 3d at 152. Put differently, and consistent with the obligation of courts to ensure "a just outcome" in disability claims, Mary K v. Berryhill, 317 F. Supp. 3d 664, 667 (D.R.I. 2018) (internal quotation marks omitted), remand is required when the ALJ's decision is based on the administrative medical findings of "state-agency physicians [who] were not privy to parts of [plaintiff's] medical record [which] detracts from the weight that can be afforded their opinions." Tegan S. v. Saul, C.A. No. 20-307PAS, 2021 WL 2562426, at *4 (D.R.I. June 23, 2021) (internal quotation marks omitted); see 20 C.F.R. § 404.1520c(c)(5) (ALJ must "consider whether new

17

evidence we receive after the medical source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive"). In this case, Dr. Warren was not privy to significant "later evidence [that] supports the [Plaintiff's] limitations" (the Armesto report and the Quinn statement), as well as evidence of "significant worsening" (the Salisbury notes). Virgen C., 2018 WL 4693954, at *3 (internal quotation marks omitted). Therefore, the ALJ's reliance on Dr. Warren's findings is error requiring remand.[11]

The Court could stop here. However, it is worth noting that the ALJ's treatment of the testimony of Plaintiff's parents and Ms. Quinn is also tainted. As to each, the ALJ focused exclusively on the portions of their testimony and statements in which each expressed an opinion on the ultimate issue of disability. Tr. 40, 42. The ALJ (correctly) rejected these "opinions" as not probative (Ms. Quinn) or not persuasive (the parents). Id. So far, so good – an ALJ need not consider an opinion on the ultimate issue of disability no matter who is its source; further, these are lay witnesses, not qualified to formulate such opinions. The problem is that the ALJ simply ignored the remainder of this evidence, which consists of unrebutted (except by Plaintiff himself) factual observations by percipient witnesses (particularly Ms. Quinn and Plaintiff's father) regarding how Plaintiff actually functioned in a work or work-like setting. Most critical are their observations of him abruptly leaving when he found the work stressful, as well as Ms. Quinn's descriptions of his off-putting behavior in the presence of others. Such facts are highly probative

---

[11] There is no need for the Court to catalog the analog to this recommendation – that the ALJ's reasons for rejecting the Cerbo and Armesto reports are also profoundly flawed. To take just one example, the ALJ criticizes them both as either inconsistent with the "longitudinal record" or not consistent with "the evidence as a whole." Tr. 41. In fact, when one focuses on the longitudinal record of the psychological testing done over time, from Dr. Bonnar in 2007 through Dr. Whipple in 2020 – they are both entirely consistent. Also simply inaccurate is the ALJ's finding that Dr. Armesto's report is based on Plaintiff's "subjective complaints over objective clinical findings." See Tr. 41. In fact, Dr. Armesto administered and relied on a battery of objective "[c]ognitive and [a]chievement" tests. Tr. 691. I recommend that these reports also be given a fresh look on remand.

in a case where Plaintiff's seeming ability to function successfully in those workplaces appeared to be fundamental to the determination that he was not disabled. Yet the ALJ articulated no reason for finding these facts to be false or exaggerated; rather, she simply ignored them. On remand, this important evidence should be afforded appropriate consideration. See e.g., Tr. 93-96, 397.

### V.     Conclusion

I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 13) be GRANTED and Defendant's Motion to Affirm the Commissioner's Decision (ECF No. 16) be DENIED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
January 5, 2022